Argued March 11, affirmed September 9, petition for rehearing
denied October 1, 1952

# GIBSON *v.* GIBSON

247 P. 2d 757

*F. J. Kucera,* of Portland, argued the cause for appellant. On the brief were Kucera & Galen, of Portland.

*William M. Dale, Jr.,* of Portland argued the cause for respondent. With him on the brief were Hicks, Davis & Tongue, of Portland.

Before BRAND, Chief Justice, and ROSSMAN, LUSK, LATOURETTE and TOOZE, Justices.

### ROSSMAN, J.

This is an appeal by the plaintiff from an order of the circuit court, entered January 5, 1951, which made provision for the custody of a child, Donna, four years of age, of which the parties are the parents. The order awarded to the defendant, the child's mother, custody for eleven months of each year and to the father, the plaintiff, custody for the remaining month. The child was born January 7, 1947. Based upon findings of cruel conduct, the circuit court, on August 23, 1949, awarded to the plaintiff a default decree dissolving the parties' marriage contract. The decree made no mention of the child. The attacked order was entered pursuant to a motion filed by the defendant December 18, 1950.

Based upon a charge that the defendant was guilty of adulterous conduct, the plaintiff claims that she is morally unfit to have custody of the child. The defendant does not contest the charge, but urges that she is not unfit to discharge the duties assigned to her by the challenged order. The issue thus precipitated is crucial.

The plaintiff and the defendant were married March 21, 1946, when the defendant was 19 years of age. The life of the couple following the marriage soon

became distracted. The defendant gave this pithy description of it:

"Trouble, fighting all the time. It was no place for a child to be. That was certain."

The following is also copied from her testimony:

"Q  Was there any drinking carried on?
"A  Yes, there was quite a bit.

"Q  Did Mr. Gibson do a good deal of drinking?
"A  Yes, he did.

"Q  Did you do some drinking also at that time?
"A  Yes, but I never drank before I married him, but I did after I married him.

"Q  By the way, do you drink now?
"A  No, I don't.

"Q  Do you smoke now?
"A  No, I never have smoked.

"Q  You don't drink and haven't had anything to drink since you left Mr. Gibson, is that right?
"A  Yes, that is right."

None of the above testimony was contradicted at the trial and none of it has been challenged. The record gives no indication as to the plaintiff's present habits concerning the use of alcoholic beverages.

In May of 1949, while the defendant was still the wife of the plaintiff, she met Glenn E. Rickman, 26 years of age, with whom she shortly began the course of adulterous conduct which the plaintiff claims renders her unfit to have the custody of Donna. Rickman at that time was married and a father. Later his wife was awarded a decree of divorce from him. July 5, 1950, he and the defendant were married.

In June of 1949 Rickman and the defendant drove to Selma, California, where he obtained temporary employment and the two began to live together. The de-

fendant brought Donna with her and made her a part of the illicit domestic establishment.

July 18, 1949, the plaintiff filed the divorce complaint which, August 23, 1949, resulted in the entry of the decree which we have mentioned. The complaint averred that the defendant was not fit to have the custody of the parties' child. Personal service was not had upon the defendant.

In July, 1949, while the suit instituted by the plaintiff was pending, the defendant returned temporarily to Portland and brought Donna with her. She had not been apprised of the suit which the plaintiff had filed and her purpose in coming to Portland was to institute a suit herself. When she reached Portland she consulted Mr. M. C. Corcoran, a Portland attorney, who told her of the proceeding which the plaintiff had begun. Upon receiving that information, she telephoned to the plaintiff, and, according to her unchallenged testimony, ''told him if he wanted to see Donna to come up there, which he did, and we were in Mr. Corcoran's office discussing the matter.'' The plaintiff was shortly joined by his attorney. Before the conference had terminated, the defendant had agreed to permit the plaintiff to have Donna for the week end. The meeting occurred upon a Friday. The plaintiff took Donna and returned her to the defendant Sunday evening. The following Wednesday or Thursday the defendant departed for Selma, California. In the meantime, the plaintiff made no effort to secure personal service upon her and the latter made no appearance in the suit which the plaintiff had filed.

The decree which the court entered August 23, 1949, as we have indicated, made no mention of the child.

Shortly after the defendant returned to Selma, Rickman's employment at that place ended and there-

upon he, the defendant and the child moved to Smith River, Del Norte County, California. Rickman's occupation is that of a herdsman on dairy farms. Following his honorable discharge from the armed services at the close of World War II, he attended a veterinarian school which trained him for the vocation which he is following. Upon reaching Smith River, Rickman resumed his occupation as a herdsman.

In March, 1950, the plaintiff called upon the defendant at Smith River. He found her living with Rickman, and pregnant. He also observed that Donna was living with them, and made a demand that she be surrendered to him. When the demand was rejected he repaired to the office of the district attorney for Del Norte County where he was advised that "I had two choices: I could have them arrested for adultery or I could hire him and he would see what kind of a settlement he could make." He added, "I chose the latter." The individual to whom he spoke was Mr. Robert F. Appel, deputy district attorney.

After the plaintiff had employed Mr. Appel as his attorney, the two visited the defendant for the purpose of determining whether an agreement could be effected governing Donna's custody. The record renders it clear that more than one conference upon the subject of custody took place before the parties were able to agree. At least one of the conferences was attended by a sister of the plaintiff and during others Rickman was present. The evidence indicates that the plaintiff returned to Portland before an agreement was achieved. A few days later, when he came back to Smith River, differences were reconciled and an agreement was reached. More than one writing setting forth the agreement was drafted by Mr. Appel before one was written which both the plaintiff and the defendant

approved. It was entitled a stipulation and was signed March 25, 1950. No one contends that it does not faithfully represent the parties' agreement. We now copy it:

"IN THE CIRCUIT COURT OF THE
STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

Raymond Gibson )
) No. 189-058
Plaintiff )
) STIPULATION
vs. )
)
Doris Gibson, )
)
Defendant )

It is hereby stipulated by and between RAYMOND GIBSON plaintiff, and DORIS GIBSON, defendant, in the above-entitled action that the court may enter and make its order in the above-entitled matter as follows:

That the issue of the marriage between plaintiff and defendant, Donna Rae Gibson, aged three years, be placed in the custody of the parties to this action in the following manner, to wit:

Plaintiff, Raymond Gibson, shall have custody of the said Donna Rae Gibson during the period corresponding to the school vacations at the place where defendant, Doris Gibson, resides, and defendant, Doris Gibson, is to have custody of said child during the school year. This is to be effective immediately.

It is further stipulated by and between the parties that the court may make an order based on this stipulation at any time after it is filed and upon its own motion and notice of the same is hereby waived."

After the paper was signed, it was delivered to the plaintiff. At that time he requested the defendant to permit him to take Donna to Portland under a promise to give her back May 1. The defendant yielded to the request, but when she came to Portland in May to receive the return of her daughter the plaintiff told her, according to her uncontradicted testimony, "I couldn't have her, that the stipulation that we signed was not worth the paper it was written on and he was going to have custody of her."

The plaintiff, who conceded that he refused to permit the defendant to have Donna when she came to Portland in May, gave the following testimony upon the subject:

"Q And wasn't the agreement between you and Doris that you were to bring her up to Oregon for the month of April?

"A Yes.

"Q And she was to have her back the first of May?

"A Yes.

"Q And isn't it a fact that you refused to turn the child over to her after she came here to get the child the first of May?

"A Yes, I did after talking to my lawyer.

"Q In other words, you made a deal with her and then you backed out. Is that right?

"A Yes."

The plaintiff swore that when he signed the stipulation which authorized the circuit court to award custody to the defendant, he did not deem her a proper person to have charge of the child. His explanation was the following: "I couldn't do anything else. There was no way I could force her to come into the State of Oregon."

When the plaintiff refused to abide by the terms of the stipulation and return the child to the defendant, she returned to Smith River. A few days later the plaintiff filed in the circuit court a motion "for an order to modify the original decree and provide that the care, custody and control of Donna Rae Gibson * * * be awarded to the plaintiff, Raymond Gibson, temporarily, until such time as the defendant, Doris Gibson, can be present in court and be given an opportunity to state her position." The motion was filed May 24, 1950, and stated that it was made ex parte.

The motion just mentioned was accompanied with an affidavit which the plaintiff had signed April 10, 1950, that is, only 16 days after the execution of the stipulation. It referred in the following vein to the stipulation and its attendant circumstances;

"That on or about March 25, 1950, I, the plaintiff Raymond Gibson, drove to Smith River, California, * * *; that at said time I consulted with the District Attorney located in the State of California; that certain legal documents were prepared, the legal effect of which I do not know, but said legal documents concerned my taking and bringing the child to Oregon; there was a purported agreement that the custody of the child should be placed with the father at one time and with the mother at another."

Those words were the only references to the "legal documents." The latter were, of course, nothing other than the stipulation. The affidavit did not disclose the fact that at the very moment when the plaintiff signed it he had in his hands the stipulation itself and delivered it to his attorney. Although a seeker of equity should be candid with the chancellor, the plaintiff did not include in the affidavit a copy of the stipulation nor give a frank delineation of its provisions. The affi-

davit, as we have seen, attributed to the plaintiff ignorance of the "legal effect" of the stipulation, but failed to account for his ignorance. It will be remembered that an attorney in his employ prepared it for him. Another attorney, also in his employ, who had familiarized himself with the stipulation, wrote the affidavit. Moreover, the matter of major interest to the court was not the plaintiff's avowed ignorance of the "legal effect" of the stipulation but the document itself. The affidavit was so phrased that the chancellor could readily infer from it that the plaintiff had only scant knowledge of the stipulation's terms. In referring to the parties' agreement, it employed the adjective "purported" although the plaintiff does not claim that the agreement was of doubtful validity.

The plaintiff's affidavit, in addition to containing the statements which we have quoted from it, said:

"It is the intention of Doris Gibson, the defendant, to come to Portland, Oregon, sometime during the month of June, 1950. It is the purpose and intention of this affidavit that the temporary care, custody and control of Donna Rae Gibson, the minor child born as issue of the marriage of Raymond Gibson and Doris Gibson, be awarded to the plaintiff, Raymond Gibson, temporarily, until such time as the defendant, Doris Gibson, can be present in court and be given an opportunity to state her position."

On the same day that the motion was filed, the court entered an order which awarded "the temporary care, custody and control" of the child to the plaintiff. It stated that the award was made "temporarily until such time as the defendant, Doris Gibson, can be present in court and be given an opportunity to state her position." According to its recitals, it was "based upon the affidavit of plaintiff and statement of coun-

sel." Those words warrant a belief that the entry of the order was not preceded by a hearing. The motion which was the precursor of the order was not served upon the defendant and she had no knowledge of it.

December 18, 1950, the defendant filed the motion which culminated in the order now under attack. It prayed that the plaintiff be required to appear at a time to be fixed by the court and "show cause why an order should not be entered as follows:

"(1) Declaring the order of this Court dated April 27, 1950 to be a nullity and vacating said order.

"(2) Awarding the care, custody and control of Donna Rae Gibson, the minor child of the parties hereto, to defendant."

January 5, 1951, the court entered the order which we have sufficiently described and which is now under attack. It declared, in part:

"The Court * * * now finds that the defendant now is a fit, proper and suitable person to have the care, custody and control of Donna Rae Gibson, the minor child of the parties hereto; that defendant now has and can provide a better home and care for said child than plaintiff now has or can provide; and that the best interests of said child would be served by being placed in the care, custody and control of defendant; * * *."

The entry of that order was preceded by a hearing, in the course of which the plaintiff, the defendant and three witnesses produced by her testified.

The unchallenged evidence indicates that prior to her marriage to the plaintiff the defendant had been honest, truthful and of good deportment. When she was ten years of age her mother died and thereupon a widow, Mrs. Laura Huffman, who lives upon a farm near Canby, assumed the responsibility of her upbring-

ing. Under interrogation by the trial judge, Mrs. Huffman gave the following testimony:

"Q From your observation was she a pretty well-adjusted girl?

"A Yes. Doris was a good girl.

"Q Did you know of her to commit any acts of indiscretion?

"A Oh, no, no. She never did."

After her marriage, the defendant became a good housekeeper and when Donna was born she became a good mother. Mrs. Huffman related incidents which showed the affection which the child manifests for her mother. Without condoning the defendant's adulterous association with Rickman, Mrs. Huffman testified: "I think she is trying to lead a good life now."

The defendant, her present husband and a child born to those two are now living upon a dairy farm near San Jose, California. The husband works upon the farm as herdsman. He receives a good salary and the occupancy of the house in which the family lives. Photographs of its exterior and interior, which are exhibits, confirm the defendant's following description of it: "a very nice home." Within two miles of their home is a school to which the pupils are taken by a school conveyance which stops in front of the Rickman's home. Although the inception of their relationship was licentious, the Rickmans declare that they have found happiness in their marriage and both manifest affection for Donna.

Unless her adulterous course of conduct disqualifies the defendant from having the custody of her daughter, the record supplies no reason for setting aside the attacked order. To the contrary, the evidence, including the plaintiff's own voluntary admissions, indicates that the defendant has always been a good housekeeper and an affectionate mother.

The plaintiff maintains his home in a house which constitutes a part of a large housing project that was built near one of Portland's shipyards during the recent war. Its occupants, in addition to Donna and the plaintiff, are the latter's mother, two of his sisters and two of his brothers. Due to the number of occupants, Donna and the plaintiff occupy the same bedroom, although they have separate beds.

The plaintiff is employed by a lumber industry and works 40 hours a week. His day's work is finished at 4:30 p. m. He described his take-home wages as "roughly around $220.00" a month. He depends upon his mother to take care of his daughter when he is at work. He added that his mother "is not exactly excellent in health" and that he had "made arrangements with my older sister that if anything happens at any time that she is to take care of Donna."

The plaintiff's mother has a part-time occupation as a house-to-house saleswoman. The sister, upon whom the plaintiff depends to care for Donna "if anything happens at any time", has been twice divorced and has two children of her own. The plaintiff, in referring to her, stated that at one time she was in "the county hospital in Portland. The time her children were taken away from her by the Court and put in a foster home. She got better and the Court gave her back her kids." Neither the plaintiff's mother nor his sister testified and no one indicated their attitude toward Donna.

The defendant visited the plaintiff's home in May and again in November of 1950. She described in the following words what she saw in May:

"It was a mess. We had to go in and clean off the davenport to sit down, * * *. There was not any clean dishes, even to feed the baby."

In November, according to her,

> "It was a little neater at that time, but it was still a mess; dirty clothes in the kitchen and there was a lot of mess under the table."

Referring to Donna's condition in May, she testified:

> "She was very messy. Her hair had not been combed all day. * * * She had dirty clothes on. * * * Her face was dirty and everything. * * * Her hair was uncombed. I combed it myself there."

When she returned in November she found that the child's "hair was not combed and her face was dirty. She had on clothes she had outgrown and they were dirty." Referring further to those clothes, she added, "I bought the material myself and made them for her."

Mrs. Huffman was with the defendant when the November visit was made. She swore:

> "There was dirty dishes in the sink, and I don't know—it just looked like they might have seen somebody coming and scattered the dirt under the table."

Upon the bathroom floor she saw "dirty towels and cigarettes." Concerning Donna, she said:

> "I wouldn't say she had been well cared for. Her hair had not been combed and she was not well dressed. Her clothes were just old."

The above testimony concerning the condition of the child and of the home was uncontradicted, unless the following testimony given by the plaintiff is at variance with it:

> "Q What about the house? You have heard the testimony here how messy it was, and so forth?
>
> "A I couldn't say as to that, I was at work at the time and I didn't get home until late.

"Q  What was the general condition of the house at that time?

"A  It was about normal. It might have been messed a little, but I wouldn't say it was dirty.

"Q  What kind of housekeeper is your mother?

"A  A very good housekeeper.

"Q  What about the care given to the child? Does she have enough sleep?

"A  All she wants.

"Q  Does she have enough to eat?

"A  Yes, all she wants.

"Q  What about her clothing?

"A  She has clothes."

As we have said, neither the plaintiff's mother nor any other occupant of his home except himself gave testimony. It seems natural to infer that if this little victim of parental strife were really welcome in her father's house some occupant of it, in addition to himself, would have testified.

Such is the situation which is disclosed by the record. And the above is the sum total of all information we have concerning the parties' homes, the fitness of each parent to have custody of the child and the influences with which the child will be brought into contact if awarded to this parent or to that one.

The plaintiff's brief argues:

"The award of the custody of the child to Appellant was and is final. There has been no change of conditions to warrant a modification of this order."

In making that assertion, the plaintiff had reference to the order which the circuit court entered May 24, 1950. That order, it will be recalled, granted the plaintiff the "temporary care, custody and control" of the child and expressly declared that it should remain

in effect only "until such time as the defendant, Doris Gibson, can be present in court and be given an opportunity to state her position." The plaintiff claims that the order was final and that the record shows no change in the conditions which prompted its entry.

██ Generally, the circuit court, after it has acquired jurisdiction over a minor child in a suit wherein one or both of its parents seek a divorce, may from time to time revise or modify any order which it made concerning the custody of the child. Judicial provisions for the custody of a child are never final, unchangeable or irrevocable: *Goldson v. Goldson,* 192 Or 611, 236 P2d 314; *Cripe v. Cripe,* 186 Or 502, 207 P2d 1049; *Gallagher v. Gallagher,* 174 Or 22, 146 P2d 768; and *Neil v. Neil,* 112 Or 63, 228 P 687. Obviously, there must be an end to controversy, especially when it arises out of the disputes of divorced parents concerning their offspring, and, accordingly, orders entered by a court upon the subject are deemed final as to the conditions existing at the time of the entry of the order. That is true even if the order was entered ex parte: *Phillips v. Phillips,* 175 Or 14, 149 P2d 967. As a result, a parent who seeks a modification of an order controlling custody has the burden of proving a change in the attendant circumstances or of showing that a material fact existing at the time when the order was made was not disclosed to the court: *Flanagan v. Flanagan* (decided August 13, 1952); *Goldson v. Goldson,* supra; *Shradar v. Shradar,* 188 Or 199, 214 P2d 803; *Cripe v. Cripe,* supra; *Leverich v. Leverich,* 175 Or 174, 152 P2d 303.

*Schmitt v. Schmitt,* 106 Or 246, 210 P 722, cited by the plaintiff, employed the principles of which we have just taken notice, even though the order entered by the court in that case employed the word "temporary".

This court attached no significance to the presence of that word in the challenged order; it said:

> "In all cases, and it is unnecessary to cite precedents thereto, the custody of the children of a divorced couple is subject continually to the orders of the court as new developments arise."

In the case at bar, the order upon which the plaintiff relies awarded custody to the plaintiff "temporarily until such time as the defendant, Doris Gibson, can be present in Court and be given an opportunity to state her position." The order was made pursuant to a motion of the plaintiff for an order of that exact kind. It is manifest that the order did not attempt to adjudicate anything concerning the defendant's "position". The latter word presumably was chosen as an equivalent for "rights" or "defense". Very likely it was intended to include within its meaning all claims to the child's custody which the defendant might care to assert by virtue of the fact that she was the mother; that is, the privilege of sharing in the child's affection and of contributing to its welfare and proper upbringing. Her "position", so far as the court knew, might cause her to contend, as she is doing, that her fitness for the delicate and responsible task of rearing the little girl is superior to that of the plaintiff. It is clear that the quoted words ("such time as the defendant can be present in Court and be given an opportunity to state her position") reserved an adjudication upon all those subjects until they were presented. It is our belief that the order did nothing except to find that the child was the proper subject for a custody order, the terms of which would be fixed when the mother appeared and had been heard. In the meantime, the order enabled the father to take the child to his home.

But even if the order of May 24, 1950 could be

deemed final as to the defendant's fitness at that time to have the custody of Donna, we are satisfied that it was subject to modification if the welfare of the child so demanded. It was subject to modification because the plaintiff failed to apprise the court of the stipulation which he and the defendant executed March 25, 1950.

*Cripe v. Cripe,* supra, declares that a custody order may be modified, not only because of a subsequent change in conditions, but also because of "material facts existing at the time of the decree but unknown to the court." Manifestly, the stipulation, and the inference warranted by it, that the defendant was a fit custodian constituted "material facts existing at the time of the decree" which were unknown to the court. The manner in which the plaintiff's affidavit, through garbled reference to the stipulation, sought to divert the court from it clearly shows that he feared that if the presiding judge became aware of the terms of the stipulation the motion would be overruled.

We do not believe that the order entered May 24, 1950, prevented the court from inquiring into the merits of the issues submitted by the motion which the defendant filed December 18, 1950.

It is unnecessary to cite authorities to warrant the statement that courts, in determining custody issues. deem that the welfare and best interests of the child are of controlling importance.

As we have seen, the mother has a good home upon a farm into which she can take Donna, while the father offers an overcrowded house where she will be subject to multiple authority. If awarded to the mother, she will receive the tender affection and understanding care which is inherent in motherhood. If given to the father, she will have his part-time attention but will be principally dependent upon two others whose

attitude toward the youngster has not been disclosed. In the past, while the child was in the mother's care, it fared well, but when in the plaintiff's keeping it was partially neglected.

■ Hundreds of decisions could be cited which indicate that since this child is a girl and is of tender years the custody should be awarded to the mother, in the absence of cogent reasons to the contrary. The rule employed in those cases is self-evident wisdom.

■ Another rule which is frequently employed in custody cases is that the children must not be awarded to anyone who is morally unfit. "The moral unfitness of a mother sufficient to deprive her of custody", so it was held in *Goldson v. Goldson,* supra, "must be such as to have a direct bearing upon the welfare of her child." The decision continued:

> "It is not for every act of indiscretion or immorality that she will be denied custody. The test is whether her conduct is so depraved, immoral, and wicked that to permit her child to remain in her custody would be injurious to its best interests."

■ The plaintiff's brief reviews a score of decisions which are submitted as support for the proposition: "A parent guilty of adultery, in the absence of special circumstances peculiar to the child or children concerned, is thereby disqualified as a fit and proper person to be awarded custody." We shall not review herein the numerous decisions cited by the parties for and against that proposition. None of them, in their essential features, are carbon copies of this case. We have a specific case to decide, the facts of which we have stated. It is our duty to do, so far as we can, what is best for the child and to refrain from subjecting it to harmful influences. In performing that duty, nothing of consequence will be gained by setting forth a comparison of other cases in which other

mothers were guilty of immorality. Ours is not a mere task of matching colors or of trying to find in the books a duplicate of this case.

In endeavoring to do what is best for the child, it is clearly our duty to take into consideration the suitability of each parent for the grave responsibility which it seeks. Suitability includes, as its most important element, character. The physical comfort of a child, as the plaintiff points out, is not all that should receive the consideration of courts in cases of this kind. Good character and high purposes, even more than physical fitness, are essentials if this little girl is to ripen into fine womanhood and lead a creditable life. A home which can offer nothing but bodily comfort will not be chosen by a court in preference to another which, although a hut, reveres the values upon which the soul and character nourish. Albeit the plaintiff condemns the defendant's lapse for a year from morality, he refrains from self-analysis and has divulged nothing about the tone of his own home.

The limited knowledge which the record furnishes concerning the plaintiff shows that his character yields under temptation. In order to persuade the defendant to part with possession of her daughter, he signed the stipulation which is dated March 25, 1950, even though he had no intention, so he swore, of abiding by it. Thus, he used his written promise as a vehicle for perpetrating deceit. Later, in order to induce the court to sign its order of March 24, 1950, he presented it with a garbled reference, under oath, to the stipulation for the purpose of detracting attention from it. In the way just indicated, he betrayed a lack of candor and willingness to face the truth. His departures from rectitude are more recent than hers, and evidently he is prepared to condone deceit and guile in himself if they advance his own purposes.

The defendant, seemingly, speaks the truth and is honest. She made no effort to conceal the fact that for one year she transgressed in a flagrant manner the moral code. In seeking to gain custody of her daughter, she has spoken the truth and has been willing to face the facts. One who is truthful and who frankly acknowledges his own vices is more likely to overcome them than another who, while revealing the faults of others, refuses to face his own.

The regrettable episode in the defendant's life, of which we have taken notice, will not necessarily have a direct bearing upon the child. If she reclaims herself entirely, that one year's lapse from morality may have no ill influence upon her daughter. We feel certain that in all events the child will receive the defendant's affection and thoughtful care.

■ Manifestly, the presiding judge is vested in cases of this kind with broad discretion in determining what is for the child's best interests and into whose custody it should be entrusted. The trial judge who entered the order under attack has had many years of fruitful experience in determining issues submitted by cases similar to this one. His experience and the prudent manner in which he has exercised his discretion commend the attacked order.

■ We are aware of no reason for believing that the trial judge abused his discretion when he entered the attacked order. He did not have the privilege of choosing between a saint and a sinner. He gave the custody to the parent who offered the greater hope. The fact that that one was the mother was a fortuitous circumstance. Without setting forth further analysis, we express our conclusion that the defendant's motion was properly sustained.

The attacked order is affirmed.